**SEALED**

# UNITED STATES DISTRICT COURT

**ORIGINAL**

for the

Northern District of Texas

CLERK U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2015 SEP 16 PM 3: 14

DEPUTY UNDER SEAL

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Information Associated with Certain Google Email
Accounts that are stored at premises controlled by
Google, Inc., further described in Attachment A

)
)
)
)
)
)

Case No. **6-15MJ 0038**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ____**Northern**____ District of ____**California**____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| Title 18, U.S.C., §§ 1341, 1343, 1349, 1621, 1956 & 1957 | mail fraud, wire fraud, conspiracy, perjury, money laundering |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by:

*William Johnston*

**William Johnston, Trial Attorney, DOJ**

*SA Johnthn W Broadway*

*Applicant's signature*

**Johnathan Broadway, FBI Special Agent**

*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____09/16/2015____

*Judge's signature*

City and state: San Angelo, TX

**E. Scott Frost, Magistrate Judge**

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CERTAIN GOOGLE EMAIL ACCOUNTS THAT ARE STORED AT PREMISES CONTROLLED BY GOOGLE, INC. | Case No. _____ <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Johnathan W. Broadway, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Google, Inc., an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.  The accounts to be searched are wattenbergenergy@gmail.com (Subject Account 1), wattenberg03@gmail.com (Subject Account 2), wattenberg.jbarron@gmail.com (Subject Account 3), and wattenbergjmontez@gmail.com (Subject Account 4) (collectively the SUBJECT ACCOUNTS).

1

2.      I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI), United States Department of Justice. I have been employed as a Special Agent of the FBI since August, 1995, and am currently assigned to the Dallas Division, San Angelo Resident Agency. During my career as a law enforcement officer, I have become familiar with and participated in all the normal methods of investigations, including, but not limited to, physical surveillance, questioning witnesses, analysis of bank records, search and analysis of publicly available information, including information accessible on the Internet, and analysis of electronic communications and general business records. I have conducted numerous fraud investigations, including health care fraud, fraud against the Government, corporate securities fraud, bank fraud, mail fraud and wire fraud. As a federal agent, I am authorized to investigate violations of laws of the United States, to include Title 18, United States Code (U.S.C.), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1349 (Attempt and Conspiracy), 18 U.S.C. § 1621 (Perjury), and 18 U.S.C. §§ 1956 & 1957 (Money Laundering), and to execute warrants issued under the authority of the United States. Since June 2015, I have been conducting an investigation of WATTENBERG ENERGY PARTNERS, LP ("WATTENBERG"), a Nevada limited partnership, which operated in San Angelo, Texas, and STANLEY JONATHAN FORTENBERRY, aka JOHN FORTENBERRY, and his son, STANLEY STEPHEN FORTENBERRY, aka STEPHEN FORTENBERRY, residents of San Angelo, Texas, collectively referred to as the subjects.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. My investigation to date has included interviews of former employees and associates of the subjects; interviews of individuals solicited for investments by the subjects; review of certain business

records related to the subjects; review of certain bank records related to the subjects; review of court records; review of publicly available information, including information available on the Internet; review of FBI files of past investigations of JOHN FORTENBERRY, including an interview of JOHN FORTENBERRY on September 21, 2005; and review of information received from the United States Securities and Exchange Commission (SEC) and state securities enforcement personnel, including affidavits and declarations filed by JOHN FORTENBERRY with the SEC and transcripts of depositions of JOHN FORTENBERRY by the SEC on June 30, 2000, November 1, 2012, and October 20-22, 2014.

## JURISDICTION

4.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## SUMMARY OF PROBABLE CAUSE

5.      JOHN FORTENBERRY, 49 years old, solicited individuals for investments in certain oil and gas development projects in Colorado offered by WATTENBERG, an entity for which STEPHEN FORTENBERRY, now 23 years old, was represented to be the Managing General Partner. As set forth below, JOHN FORTENBERRY made false and misleading representations to the solicited individuals to induce them to send money to WATTENBERG. As further set forth below, there is probable cause that JOHN FORTENBERRY and STEPHEN FORTENBERRY, 23 years old, since 2013, individually and through their ownership and/or control of WATTENBERG, have engaged in a scheme and artifice to defraud others utilizing the United States Postal Service (USPS), a commercial interstate carrier and interstate wire services.

3

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that JOHN FORTENBERRY and STEPHEN FORTENBERRY, individually and through their ownership and/or control of WATTENBERG, have engaged in violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. §1343 (Wire Fraud), 18 U.S.C. § 1349 (Attempt and Conspiracy), 18 U.S.C. § 1621 (Perjury), and 18 U.S.C. §§ 1956 & 1957 (Money Laundering).  There is also probable cause to search the SUBJECT ACCOUNTS, further described in Attachment A, for evidence and instrumentalities of these crimes in the manner described in Attachment B.

### PROBABLE CAUSE TO SEARCH E-MAIL ACCOUNTS

#### Sanctions for past violations of securities laws

7.     JOHN FORTENBERRY, 49 years old, has been involved since approximately 1998 in the business of selling the names and contact information of potential investors to individuals seeking funding for various projects.  He has also, at times, been involved with identifying and recruiting individuals to invest in ventures sponsored by third parties as well as ventures controlled by himself.

8.     Online records of the Pennsylvania Securities Commission show the commission announced on September 7, 2004, it had issued a Summary Order to Cease and Desist against JOHN FORTENBERRY (identified in the order as Stanley J. Fortenberry) for offering unregistered securities to Pennsylvania residents via a website and via documents transmitted via facsimile machine.  The securities were one-percent working interests in an oil well drilling project in Scurry County, Texas, priced at $8,734 each.  The offering material included projections of "100% return to investors within the first 12 months and continued profits thereafter of 70% per year for 9 years."

9.      Online records of the Texas State Securities Board show the board entered an

Agreed Cease and Desist Order against JOHN FORTENBERRY (identified in the order as

Stanley J. Fortenberry) on November 30, 2004, related to the sale of the working interests in the

Scurry County drilling project. The working interests were securities as that term is defined in

the Texas Securities Act and were not registered with the Texas Securities Commissioner.

JOHN FORTENBERRY was not registered as a securities dealer or agent with the Securities

Commissioner. The agreed order, signed by JOHN FORTENBERY, concluded that he had

engaged in fraud in connection with the offer for sale of the securities when he intentionally

failed to disclose material facts, including information regarding the financial and operating

history of the issuer; the specific risks associated with the investment, including the risk that a

working interest owner may be liable for costs or claims in excess of the amount of his

investment; FORTENBERRY's theft conviction in Travis County, Texas, on February 2, 1990;

and his personal bankruptcy filings on August 3, 1992, and December 16, 1993.

10.     On September 24, 2010, the Securities and Exchange Commission (SEC) initiated

an investigation of Breadstreet.com, Inc. ("Breadstreet"). The SEC investigation and an earlier

FBI investigation showed JOHN FORTENBERRY was closely affiliated with Breadstreet. The

SEC obtained evidence that Breadstreet's website routinely included general solicitations for

investment in unregistered securities offerings. During the course of its investigation of

Breadstreet, the SEC obtained evidence that JOHN FORTENBERRY and his associates, through

Breadstreet, had raised at least $300,000 from two individuals for investment in Premier

Investment Fund, LP ("Premier"), a Tennessee limited partnership for which JOHN

FORTENBERRY acted as General Partner. The SEC's investigation determined that JOHN

FORTENBERRY solicited investors for Premier without disclosing he was the subject of cease-

and-desist orders issued in 2004 by two state securities regulators. Those orders were issued against "Stanley J. Fortenberry." He used the name "John," a misspelling of a shortened version of his middle name, Jonathan, while soliciting investors for Premier.

11.     In July 2013, the SEC notified JOHN FORTENBERRY of a proposed enforcement action against him related to Premier. On April 28, 2014, the SEC issued an order instituting cease-and-desist proceedings against JOHN FORTENBERRY. An Initial Decision by the SEC filed on March 2, 2015, concluded that JOHN FORTENBERRY willfully violated the antifraud provisions of the securities laws and made many false statements during his sworn testimony provided during the investigation. The Decision, which became final on April 7, 2015, barred JOHN FORTENBERRY from the securities industry, assessed civil penalties of $900,000 and ordered him to disgorge $146,500 which he looted from Premier.

<u>Creation of Wattenberg Energy Partners, LP</u>

12.     Nevada Secretary of State online records show WATTENBERG was formed as a Nevada limited partnership on April 4, 2013. One of the General Partners of WATTENBERG reflected in the records was STEPHEN FORTENBERRY, who was 20 years old at the time. Also on April 4, 2013, WATTENBERG's website, <u>www.wattenbergenergypartners.com</u>, was registered with GoDaddy, Inc. ("GoDaddy"), according to a "whois" search tool available on GoDaddy's website. The registrant is listed as STEPHEN FORTENBERRY, e-mail address wattenbergenergy@gmail.com (Subject Account 1). The physical street address listed for STEPHEN FORTENBERRY was 2241 Hillside Drive, San Angelo, Texas. Tom Green County Central Appraisal District online records show that property is the homestead of JOHN FORTENBERRY and his wife. GoDaddy records show several e-mail addresses for the domain ending with "@wattenbergenergypartners.com" were created. GoDaddy records show two other

domain names associated with the account established by STEPHEN FORTENBERRY, www.petroinvesting.com and www.bigwoil.com.

13.     On April 10, 2013, STEPHEN FORTENBERRY opened a checking account for WATTENBERG at a Bank of America branch in San Angelo. He signed the opening documents as General Partner of WATTENBERG and was the sole signer on the account. The mailing address on the account was the FORTENBERRYS' residence in San Angelo. Following an initial deposit of $100 of unknown origin, subsequent cash deposits totaling $1,715 were made to the account from April 11, 2013, to May 8, 2013, at branches in Redondo Beach and Los Angeles, California.

14.     On April 22, 2013, an SEC Form D, Notice of Exempt Offering of Securities, was electronically filed for WATTENBERG for an indefinite offering amount of oil and gas equity securities. WATTENBERG's principal place of business was listed as 9 Parish Avenue, Johnstown, Colorado. The submitter is shown as STEPHEN FORTENBERRY, Managing General Partner. His electronic signature reads "STEPHEN FORTENBERRY II." An amended Form D was filed that same day showing the filing was for a $1,650,000 offering of mineral property securities. The address for STEPHEN FORTENBERRY was also changed from the FORTENBERRYS' residence in San Angelo to 9 North Parish Avenue, Johnstown, Colorado. The street prefix "North" was apparently erroneously omitted from the address listed for WATTENBERG. Bank records, including debit card purchase data, for both JOHN FORTENBERRY and STEPHEN FORTENBERRY indicate they continued to live in San Angelo.

15.     An online article published by a Johnstown area newspaper in February 2013, reported that Ranchers Exploration Partners, LLC ("Ranchers"), a Nevada limited liability

company, and affiliated companies were operating out of the 9 North Parish Avenue location under the banner "Energy Services." An individual formerly employed in the "Energy Services" office told the FBI that Melvin Lloyd Richards, a/k/a Lloyd Richards, was the "boss" of Ranchers. SEC records show Richards was sanctioned twice during the 1970s for violating the anti-fraud provisions of securities laws. Federal court and FBI records show Richards has been thrice convicted in federal courts on charges related to securities fraud and income tax evasion. He was sentenced to 87 months imprisonment following his most recent conviction in 2000.

16.     Colorado Oil and Gas Conservation Commission (COGCC) online records show that Ranchers was a licensed oil operator in Colorado. The owner of a house in the Johnstown, Colorado, area provided the FBI a copy of a six-month residential lease agreement effective November 2012, signed by JOHN FORTENBERRY. The named tenant in the lease agreement was Ranchers. The individual formerly employed in the Energy Services office advised that JOHN FORTENBERRY worked out of that office soliciting individuals on behalf of a company called First Choice for investments in drilling projects for which Ranchers was to be the operator.

17.     First Choice has been further identified through investigation to be First Choice Energy Partners, L.P. ("FCEP"), one of several entities affiliated with Alvin Roy Brown, a/k/a Al Brown, a resident of Redondo Beach, California, who was the target of an SEC complaint filed in the United States District Court for the Central District of California in March 2013, alleging fraudulent conduct in the sales of securities since January 2011. Nevada Secretary of State online records show FCEP was registered as a domestic limited partnership on March 12, 2012. The SEC action eventually encompassed FCEP. The court-appointed permanent Receiver reported that she received no cooperation from JOHN FORTENBERRY whom she described as

a key witness and one of the largest recipients of funds from the various Brown-affiliated entities, having been paid approximately $170,600. On May 20, 2014, the California Business, Consumer Services and Housing Agency, Department of Business Oversight, issued a desist-and-refrain order against Brown and his affiliated entities after finding that the entities had engaged in the sale of non-qualified securities, FCEP having done so through its website, www.firstchoiceoilandgas.com.

18.     During sworn testimony before the SEC in Dallas, Texas, on October 21, 2014, JOHN FORTENBERRY testified that he posted a video of himself on FCEP's website wherein he explained a "no-dry-holes guarantee" offered to prospective investors. He explained in the video that FCEP was able to offer such a guarantee because "with today's technology we can drill a hole deep inside the earth that's a test hole. The test hole allows us to drop down some logging equipment where we're expecting oil to be at. The logging equipment then tells us if there is indeed oil to be found or not. At this point, there's very little cost that's actually involved to do the test hole and to log it to see if it's going to be a successful well. If for any reason, it's not a successful well, or it's not going to produce properly, we just simply fill that hole and we drill another one. So it makes sure that you're a success each and every time." FORTENBERRY continued, "The other factor is we're drilling in the Denver-Julesburg (DJ) Basin. And all the studies show, and all companies in the area agree, that a 98.9% success rate is the standard in the entire oil field." FORTENBERRY stated, "...we intend on drilling five-hundred wells over the next five years. Our crew and our team have experience, they've done it before, we're going to do it again. Five-hundred wells."

19.     A copy of FCEP's website archived on September 26, 2012, and publicly available on the Internet shows it was marketing 1% working interests in one well for $16,500

with a return of "$600 per month...with guaranteed oil production." A statement attributed on the website to Brown, who was identified on the website as General Partner of FCEP, reads, "I know what your [sic] thinking what if it['s] not real and I lose. That is why I created the guarantee. I guarantee 10% return while you wait for your well to be completed. I guarantee a productive well 40 barrels per day of gas and oil." The claim continued, "My friend there is guaranteed income waiting for you... There is only a window of time for you to participate." The investment offer was described as "a fabulous opportunity for you to get $600 dollars (sic) per month for decades..." The oil well project for which Ranchers was the operator was named "The Windsor 14 Drilling Program" and was to involve the drilling of up to 14 wells in the DJ Basin's Wattenberg field. According to material available on FCEP's archived website, the anticipated cost for each well for which investor funds were being solicited was $1,650,000.

20.     JOHN FORTENBERRY received his last incoming wire deposit from one of Brown's affiliated entities to his personal Bank of America checking account, the only personal checking account for him during this time period identified by the FBI, on March 7, 2013, the day the SEC filed its complaint against Brown, et al. From March 22, 2013, to April 9, 2013, fourteen cash deposits totaling $8,700 were made to JOHN FORTENBERRY's personal Bank of America checking account at a branch in Redondo Beach, California, the same branch at which other cash deposits were made to WATTENBERG's checking account. The individual formerly employed in the Energy Services office told the FBI that JOHN FORTENBERRY left Johnstown and returned to San Angelo after the SEC shut down Brown's operations in California. Bank records indicate JOHN FORTENBERRY was back in San Angelo by the end of March 2013, just days before the creation of WATTENBERG on April 4, 2013.

21.     FedEx Corporation ("FedEx") records show an account was opened on May 16, 2013, for WATTENBERG. The company's address and telephone number on the account were the same as the FORTENBERRYS' residence in San Angelo. The e-mail address on the account was listed as wattenbergenergy@gmail.com, Subject Account 1. The contact name on the account was STEPHEN FORTENBERRY.

Soliciting Investors for Wattenberg Energy

22.     Several individuals have told the FBI or reported to state securities regulators that JOHN FORTENBERRY and other individuals, including some identified as having previously been associated with FCEP, et al., solicited investors for WATTENBERG by cold-calling individuals. The individuals reported that WATTENBERG'S website, www.wattenbergenergypartners.com was also used to solicit prospective investors. JOHN FORTENBERRY portrayed to WATTENBERG investors that he was working in Johnstown near the Wattenberg field, the site of the company's proposed drilling projects, even though he had left Colorado at the end of March 2013, following the SEC's action against FCEP, et al. He told investors that WATTENBERG was his son's company and that STEPHEN FORTENBERRY ran the company from San Angelo. The materials provided to prospective and current investors via the company's website, correspondence sent via e-mail accounts established with GoDaddy under WATTENBERG's website's domain name and Subject Account 1, an e-mail account established with Google, Inc., and material and correspondence sent via the USPS and FedEx, were provided under the name "STEPHEN FORTENBERRY II" as Managing General Partner. That material, in 2013, showed the company's address as Number 9 North Parish Street, Johnstown, Colorado. One investor came to understand through telephone conversations with JOHN FORTENBERRY that STEPHEN FORTENBERRY was an attorney

with an office in San Angelo who handled the company's paperwork including investors' subscription agreements.

      23.     In the offering material WATTENBERG was portrayed as having an extensive staff. The material included a list and biographical summary of "Operations and Field Management" personnel with titles such as "Chief Fluids, Operations and Construction Engineer," "Field Guidance Director," "Budgeting and Cash Flow Director," and "Financial Planning Director." FBI interviews of WATTENBERG investors and copies of e-mail correspondence provided by them show that at least two of the individuals listed as holding those positions were involved in soliciting investors for WATTENBERG via telephone calls and e-mail communications. The "Field Guidance Director" was listed as Lloyd Richards; however, his affiliation with Ranchers was not mentioned.

      24.     The WATTENBERG offering material listed "STEPHEN FORTENBERRY II" as the "Director of Operations" and described him as having "a strong history in and around the oil and finance industry... He has worked for such organizations as Sitel Corporation for Capital One Bank." While Sitel Corporation does have an office in San Angelo, Texas Workforce Commission records show no wages reported by any employer for STEPHEN FORTENBERRY prior to the fourth quarter of 2014, around the same period in which WATTENBERG ceased operating. The biography for STEPHEN FORTENBERRY continued, "Further, he has performed well with such companies as Futura Financial Fund." SEC and FBI records show Futura Financial Fund, Inc., was an entity previously operated by JOHN FORTENBERRY but which had ceased operations years earlier when STEPHEN FORTENBERRY was a teenager. There is no mention of JOHN FORTENBERRY in the offering material.

25.     Individuals who have been interviewed by the FBI or reported information to state securities regulators also provided copies of correspondence and documentation received from WATTENBERG which show that the individuals were initially being solicited to pay $16,500 for a 1% working interest in an oil project in Larimer County, Colorado, named WEP River West #2, which would entitle the investor to a .65% net revenue interest in the well. The projected return to the investor was $600 per month, the same pitch used by FCEP. WEP was apparently a designation for Wattenberg Energy Partners, LP, i.e., WATTENBERG. Documentation provided to prospective investors indicated that WATTENBERG was the project's operator; however, the documentation reflected the Colorado operator identification number assigned by the COGCC to Ranchers. COGCC online records do not reflect WATTENBERG as a licensed operator in Colorado.

26.     One of the 14 wells proposed in "The Windsor 14 Drilling Program" for which Ranchers was the operator and which had been touted by FCEP was named River West #2. Copies of records received from Ranchers show Ranchers was selling 1% working interests in the River West #2 project for $12,850. Bank records and records received from Ranchers and WATTENBERG investors indicate that WATTENBERG's WEP River West #2 project was merely a mechanism whereby WATTENBERG could sell the equivalent of a 1% working interest in Ranchers' River West #2 well at a $3,650 markup. Those same records show, however, that WATTENBERG did not purchase from Ranchers the same number of 1% working interests in the River West #2 project as it sold through its WEP River West #2 offering.

27.     Offering material sent to prospective investors in the WEP River West #2 project stated that drilling projects in the Wattenberg field "consistently have 98.9% success rate," and "our drilling manager has completed over 1500 wells in the Wattenberg field without a single

failure." The material also stated, "This project will be ready to drill in one month or sooner and there is capital in place to drill it." One investor, an 80-year-old man from Iowa, told the FBI that JOHN FORTENBERRY told him during a telephone call prior to the investor sending his money to WATTENBERG in May, 2013, that a drilling permit for the River West #2 well had already been issued by the state. COGCC online records show that Ranchers had been informed by the commission by letter dated March 13, 2013, that it had withheld Ranchers' applications for drilling permits for the River West #2 and other wells because the COGCC believed that Richards and/or one of his associates exercised a sufficient level of control over Ranchers causing Ranchers to be affected by the COGCC's January 2011, orders in which it barred any entity for which Richards or that associate were principals, majority owners, operational or general managers, or otherwise exercised control, from drilling in Colorado until the orders were satisfied, including the payment of a $150,000 fine. The orders related to the violation of bonding requirements and failure to perform abatement and corrective actions at a well site by entities affiliated with Richards and his associate.

28.     An individual who invested in the WEP River West #2 project in July 2013, reported to the Colorado Division of Securities that he was informed via an e-mail communication from Subject Account 1 under the name STEPHEN FORTENBERRY II that flooding in the area in September 2013, contributed to the delay in drilling of the well. The application by Ranchers for a permit to drill the River West #2 well was still unapproved by the COGCC at that time. The application was not approved by the COGCC until January, 2014.

29.     The first shipment billed to WATTENBERG's FedEx account was a package shipped from an investor to the company and delivered to the FORTENBERRYS' residence in San Angelo on May 21, 2013. The package apparently contained the investor's personal check

in the amount of $16,500 for the WEP River West #2 project which was deposited to WATTENBERG's bank account the same day. FedEx records show deliveries addressed to WATTENBERG from investors continued to be delivered to the FORTENBERRYS' residence through January, 2014.

30.     In January 2014, STEPHEN FORTENBERRY, accompanied by his father, signed a lease for commercial office space in downtown San Angelo for WATTENBERG. The landlord told the FBI that she communicated with STEPHEN FORTENBERRY via e-mail messages sent to an e-mail account associated with WATTENBERG's website and the e-mail account named Subject Account 1. In February 2014, employment advertisements for WATTENBERG ran in the local San Angelo newspaper seeking call operators at $9.00 per hour and office staff. The advertisement instructed interested individuals to send their resumes to wattenbergenergy@gmail.com. Texas Workforce Commission records show WATTENBERG began reporting wages paid to employees during the first quarter of 2014.

31.     Although JOHN FORTENBERRY apparently made efforts to avoid documented association with WATTENBERG, two former WATTENBERG employees interviewed by the FBI described WATTENBERG as JOHN FORTENBERRY's company. They said he ran the company despite his explanation to them that he was just helping STEPHEN FORTENBERRY who was dealing with drug addiction issues. Although JOHN FORTENBERRY was not a signer on WATTENBERG's checking account at Bank of America, he did have online access to the account. One of WATTENBERG's former employees who was interviewed by the FBI said that JOHN FORTENBERRY gave her the account logon name and password which she used at his direction to transfer funds to other Bank of America accounts, including his and STEPHEN

15

FORTENBERRY's personal checking accounts, as well as to initiate wire transfers from the account.

32.     All but one of the investors in WATTENBERG interviewed by the FBI to date, or who have provided information to state securities enforcement investigators, identify JOHN FORTENBERRY as one, if not the only, person from WATTENBERG who made the detailed investment pitch.[1] Other individuals, including some who had solicited investors for FCEP, solicited via telephone calls and e-mail messages investors on behalf of WATTENBERG using e-mail accounts associated with WATTENBERG's website, www.wattenbergenergypartners.com. The other solicitors were paid a commission on funds received by WATTENBERG from investors whom they had participated in soliciting. A former WATTENBERG employee told the FBI that she transferred funds, at JOHN FORTENBERRY's direction, from WATTENBERG's bank account to a Bank of America account for an entity named "Gold Dog" to pay commissions due to one of those solicitors. Bank records show $60,750 was transferred from WATTENBERG's bank account to an account for Gold Dog Advisory, LLC from July 10, 2013, to May 2, 2014. Bank records show additional transfers of funds from WATTENBERG's account to other individuals identified by the former employee as solicitors for WATTENBERG.

33.     By May 21, 2013, checks from the first two investors in the WEP River West #2 project, each in the amount of $16,500, had been deposited to WATTENBERG's bank account at Bank of America, the only bank account for WATTENBERG known to investigators. Each of those investors said during FBI interviews that they were called by JOHN FORTENBERRY and

---

[1] For a few months, WATTENBERG employed callers who made the initial investment pitch and then, if there was interest, they would pass along the potential investor to JOHN FORTENBERRY to explain the details and make the closing.

solicited for an investment in an oil well.  WATTENBERG did not invest these investors' funds

in an oil well.  By June 3, 2013, the balance in WATTENBERG's bank account had been drawn

down to approximately $1,776.27.  Disbursements in the interim included:

| Disbursement Description | Amount |
|---|---|
| Auto Wrangler – purchase of used pickup truck titled in WATTENBERG's name | $10,000 |
| John C. Nimmer, an attorney who was representing JOHN FORTENBERRY in the SEC's ongoing investigation related to Breadstreet and Premier. | $ 3,000 |
| WATTENBERG solicitor, apparently representing a 15% commission on one of the investor payments | $ 2,475 |
| Transfer of funds to JOHN FORTENBERRY's personal checking account at Bank of America | $ 6,500 |
| Cash withdrawals, including one transaction consistent with a 15% commission on the other investor payment | $ 4,775 |

34.     On June 4, 2013, the initial investor in WATTENBERG, a 67 year old man,

transferred via wire $16,500 to WATTENBERG's bank account for the purchase of a second 1%

working interest in the WEP River West #2 project after further solicitation by WATTENBERG.

In addition to receiving telephone solicitations from JOHN FORTENBERRY, the investor

received calls from a second individual soliciting for WATTENBERG.  None of the investor

funds was invested in an oil well by WATTENBERG.  By June 21, 2013, the balance in

WATTENBERG's bank account was $260.17.  Disbursements in the interim included:

| Disbursement Description | Amount |
|---|---|
| John C. Nimmer, an attorney who representing JOHN FORTENBERRY in the SEC's ongoing investigation related to Breadstreet and Premier | $ 8,000 |
| Transfer of funds to JOHN FORTENBERRY's personal checking account at Bank of America | $ 2,500 |
| Transfer of funds to STEPHEN FORTENBERRY's personal checking account at Bank of America | $ 1,000 |
| Cash withdrawals, including one transaction consistent with a 15% commission on the investor payment | $ 5,674 |

17

35.     Bank records show that from June 24, 2013, to August 2, 2013, $165,000 was

deposited into WATTENBERG's bank account, apparently representing payments for the

purchase of ten 1% working interests at $16,500 each.  The purchasers of six of those units have

been identified to date as investors in the WEP River West #2 project.  Several of the remitters of

those funds were from states other than Texas, including California, Pennsylvania, and Rhode

Island.  On August 23, 2013, and August 27, 2013, two checks in the amount of $21,500 each

were deposited into WATTENBERG's bank account, apparently representing payments for the

purchase of 2 units in the WEP River West #2 project at an increased price.  The purchaser of

one of those units has been identified to date as a 92-year-old Arkansan investor in the WEP

River West #2 project.  He provided to state securities regulators offering material he received

from WATTENBERG for the WEP River West #2 project reflecting a purchase price of $21,500

for a 1% working interest.   On September 5, 2013, a check in the amount of $10,750 from an

identified investor from Colorado for the WEP River West #2 project was deposited to

WATTENBERG's bank account, apparently for the purchase of one-half of a 1% working

interest at the new price.

36.     From the payments from investors totaling $218,750 for the purchase of twelve

and one-half 1% working interests in the WEP River West #2 project credited to

WATTENBERG's checking account from June 24, 2013, to September 5, 2013,

WATTENBERG, in turn, purchased only five 1% working interests in Ranchers' River West #2

project.  During that period $64,250 was sent via wire from WATTENBERG's checking account

to a Colorado law firm acting as escrow agent for Ranchers' River West #2 project.  Records

provided by Ranchers to the FBI reflect that the $64,250 was for the purchase of five 1%

working interests in the River West #2 well by WATTENBERG.  No further transfers were made from WATTENBERG's Bank of America checking account to the escrow agent. Ranchers' records show no further purchases of working interests in any of its projects by WATTENBERG.  By September 17, 2013, the balance in WATTENBERG's bank account was negative.  Other disbursements from the remaining $154,500 collected from investors during that period included:

| Disbursement Description | Amount |
|---|---|
| John C. Nimmer, an who was attorney representing JOHN FORTENBERRY in the SEC's ongoing investigation related to Breadstreet and Premier | $ 7,175 |
| Transfer of funds to checking account of Gold Dog Advisory, LLC at Bank of America | $16,200 |
| WATTENBERG solicitor, apparently representing a 15% commission on investor payments for two 1% working interests @ $16,500 each | $ 4,950 |
| Transfer of funds to JOHN FORTENBERRY's personal checking account at Bank of America | $30,640 |
| Transfer of funds to STEPHEN FORTENBERRY's personal checking account at Bank of America | $ 1,000 |
| Transfer of fund to the personal checking account at Bank of America of another of JOHN FORTENBERRY's sons | $ 2,600 |
| Cash withdrawals - 40 transactions | $70,619 |

The remaining disbursements included business and what appear to be personal expenses.  The business expenses included filing fees paid to securities regulators in six states.

37.    From November 2013 to July 2014, WATTENBERG solicited and obtained a total of $335,000 from investors, funds that are believed to have been for the WEP River West #2 project and other projects.  Those investors were residents of North Carolina, New Mexico, Washington, Colorado, California and Texas.   Disbursement of those funds included:

| Disbursement Description | Amount |
|---|---|
| John C. Nimmer, attorney representing JOHN FORTENBERRY in the SEC's ongoing investigation related to Breadstreet and Premier | $10,460 |

| Disbursement Description | Amount |
|---|---|
| Transfer of funds to checking account of Gold Dog Advisory, LLC at Bank of America | $44,550 |
| Transfer of funds to JOHN FORTENBERRY's personal checking account at Bank of America | $57,290 |
| Transfer of funds to STEPHEN FORTENBERRY's personal checking account at Bank of America | $92,400 |
| Transfer of funds to the personal checking account at Bank of America of another of JOHN FORTENBERRY's sons | $12,970 |
| Cash withdrawals – 21 transactions | $39,855 |

The remaining disbursements included business and what appear to be personal expenses. By the end of August, 2014, the balance in WATTENBERG's bank account was $102.29. According to WATTENBERG's landlord, who was interviewed by an SA with the FBI, WATTENBERG made its last office lease payment in August, 2014, and by the end of 2014 WATTENBERG's San Angelo office was abandoned. WATTENBERG apparently collected no further funds from investors.

38.     COGCC online records show the River West #2 well was spudded on March 2, 2014, and began producing in May 2014. Ranchers provided to the FBI a copy of a letter dated August 1, 2014, addressed to the working interest owners of the River West #2 well wherein Ranchers reported that the well had been completed and was producing. Ranchers also reported that as of July 15, 2014, 594 barrels of oil from the well had been sold, with the proceeds being held in an escrow account while it resolved an issue related to the ownership of the mineral interests in the land on which the well was drilled. A copy of the Ranchers letter was recovered by the FBI from WATTENBERG's abandoned office in downtown San Angelo. Ranchers' records show that once the issue regarding the mineral interest ownership was resolved, Ranchers filed in April and May 2015, assignments of interests in the well assigning WATTENBERG its 3.25% net revenue interest. Ranchers' records show that it then disbursed

20

two checks totaling $5,721.10 to WATTENBERG for its share of the revenues generated from the sale of oil produced from the well. It is unknown to the investigators where, or if, those checks were tendered for payment. None of the investors in the WEP River West #2 project interviewed by the FBI or who have provided information to state securities regulators reported receiving any return on or return of their investment.

39.     In an e-mail to the WEP River West #2 investors sent on July 17, 2014, from an e-mail account associated with WATTENBERG's website, the investors were advised that drilling had been completed and, although production had not yet commenced, "everything looks good up to par and ready to go." On September 10, 2014, another e-mail from an e-mail account associated with WATTENBERG's website to the WEP River West #2 investors advised them, "We at this point are still waiting on utilities and power company." The message continued, "Also we will be getting an appraisal done on the company showing the return of your investments. I will be giving you all an update as it commences."

40.     An undated handwritten document found in WATTENBERG's abandoned office by the FBI appears to be a draft of a letter to WEP River West #2 investors as a follow up to the September 10, 2014 e-mail message. The letter was apparently not sent as no investor contacted by investigators to date has reported receiving such a letter. The content of the draft, however, shows a continuing intent to deceive. The handwriting appears to be JOHN FORTENBERRY's. The letter which apparently refers to each investor's investment reads, in part, "As you are aware you will be receiving monthly disbursements soon. Additionall[y] after we had a[n] appraisal performed on WEP Riverwest #2 (our holding) in the Riverwest #2 project we find that your current assets are $80,000 with monthly checks to follow. The above asset can not be sold till after one year from date of appraisal [-] however it is yours. Finally, the terms of our

21

subscription stated office and administrative expense could be more than originally anticipated and due to several delays it was. For this we appologize (sic). But if you are satisfied with the current state of WEP and its operation regarding you having $80,000 in certified appraised assets representing a $100% profit/growth in your account and the prospect of ~~$1200.00~~ checks $660.00 per month please acknowledge your satisfaction by signing below."

41.     Additional e-mail messages sent from an e-mail account associated with WATTNBERG's website sent to the WEP River West #2 investors on September 12, September 17, and October 14, continued with the message that the well was drilled but various issues were causing a delay in production. An October 29, 2014, e-mail message stated, in part, "The money that you have invested is currently going into escrow and is safe." An e-mail message sent on October 31, 2014, from WATTENBERG to one of the investors who had requested a return of his investment reads, in part, "I do not have access to the money from the Riverwest #2. It has already been placed in the project so I cannot refund your money... No one has lost there (sic) money in this investment to my knowledge its just another bump in the road we have encounter[ed] and it should be resolved just fine..."

42.     Another project for which WATTENBERG solicited investors was referred to in offering material as "Wattenberg Spindle Big 10 Joint Venture." In an e-mail message dated March 21, 2014, utilizing an e-mail account associated with WATTENBERG's website, to a 75-year-old investor in the WEP River West #2 project who was being solicited for the Spindle Big 10 project, one of WATTENBERG's solicitors wrote, in part, "Expected yield should return your investment within 9 to 12 months... Our strategic partner/drilling contractor is Kerr-McGee... One well of the ten is completed. Two others are currently being drilled. You may access the Company's restricted website http://www.wattenbergenergypartners.com using the confidential

password "hoa#5". Select Spindle Big 10 to access the relevant information. I will call you soon to follow up..." Other e-mail messages and documentation obtained from WATTENBERG's abandoned office by the FBI indicate the project was also referred to as the WATTENBERG-Sureland Joint Venture. The investor sent $75,000 to WATTENBERG the following month for investment in that venture. Two other investors paid WATTENBERG a total of $100,000 in March and April 2014, for investment in the venture. Those funds were disbursed as noted above.

43.     Of the $92,400 transferred from WATTENBERG's bank account to STEPHEN FORTENBERRY's account between November 2013 and August 2014, $55,000 was subsequently transferred via wire on July 16, 2014, to a company called Swan Energy, Inc., an entity apparently unrelated to any heretofore mentioned, for an investment by STEPHEN FORTENBERRY as an individual in an oil development project called 2-A Joint Venture. Bank records and information provided by a former WATTENBERG employee indicate that STEPHEN FORTENBERRY had left San Angelo approximately two weeks earlier to enter a drug rehabilitation facility near Kerrville, Texas. An employee of Swan Energy, Inc., interviewed by the FBI stated that the company initially received $55,000 via wire from WATTENBERG for the 2-A Joint Venture investment; however, it returned the funds to WATTENBERG because STEPHEN FORTENBERRY had completed an investor application in his name rather than in WATTENBERG's name and Swan Energy, Inc. could only accept funds from the named investor.

44.     Documentation from Swan Energy, Inc., recovered from WATTENBERG's abandoned office in San Angelo by the FBI states that the 2-A Joint Venture was formed to participate in the drilling of a certain well in Weld County, Colorado. COGCC online records

show the operator on the project was Encana Oil & Gas, Inc. The COGCC records show the well began producing in approximately June, 2014. In an e-mail message dated July 21, 2014, sent from an e-mail account associated with WATTENBERG's website to the Wattenberg-Sureland Joint Venture investors, the well associated with 2-A Joint Venture is identified as "the first of several wells that will be in it Joint Venture (sic)," apparently meaning the Wattenberg-Sureland Joint Venture. Of the $175,000 collected from investors for the Wattenberg-Sureland Joint Venture, the $55,000 investment in STEPHEN FORTENBERRY's name is the only use of those funds related to an oil well project.

45.     Checks totaling $6,360.27 from Swan Energy, Inc., payable to STEPHEN FORTENBERRY were deposited to his personal bank account from September 10, 2014, to December 30, 2014. An employee of Swan Energy, Inc., interviewed by the FBI identified those checks as payments for STEPHEN FORTENBERRY's share of the 2-A Joint Venture's earnings. On September 10, 2014, an e-mail message sent from an account associated with WATTENBERG's website, with a subject line of "Update with Sureland," informed the investors, "You will be receiving a check in the next few days." No checks payable to the investors ever cleared WATTENBERG's checking account. During November and December, 2014, $2,865 was transferred in two transactions from STEPHEN FORTENBERRY's personal checking account to WATTENBERG's account. The transfers of funds from STEPHEN FORTENBERRY's checking account were followed by wire transfers totaling $1,289.62 from WATTENBERG's checking account to one of the investors in the WATTENBERG-Sureland Joint Venture. Those are apparently the only payments from WATTENBERG's checking account to an investor from its opening to its closing. These diversions and misuses of funds created probable cause that JOHN and STEPHEN FORTENBERRY devised a scheme and

artifice to defraud investors, in violation of 18 U.S.C. §§ 1341, 1343, & 1349, and committed

money laundering, in violation of 18 U.S.C. §§ 1956 & 1957.

46.     During his October 21, 2014, sworn testimony before the SEC in Dallas, Texas,

regarding Premier, JOHN FORTENBERRY denied involvement with WATTENBERG. He

testified, "No, I don't run the company. That is my son's company." When pressed by the SEC

attorney as to whether he was running WATTENBERG, JOHN FORTENBERRY responded, "I

think your questions are, sir, irrelevant to my case and why we are in Court today... I don't work

for this company at all." These misstatements create probable cause that JOHN

FORTENBERRY committed perjury, in violation of 18 U.S.C. § 1621.

## PROBABLE CAUSE TO BELIEVE EVIDENCE AND INSTRUMENTALTIES OF CRIME ARE LOCATED WITHIN THE SUBJECT ACCOUNTS

47.     As set forth above, JOHN FORTENBERRY used Subject Account 1 in

furtherance of fraud. Specifically, Subject Account 1 was used to solicit investors, send

investment materials, and communicate about the status of the investments. Accordingly, there

is probable cause to believe that evidence and instrumentalities of fraud are located within

Subject Account 1.

48.   Additionally, Subject Accounts 2, 3, and 4, also established through Google,

Inc., have been used by WATTENBERG employees while they worked at WATTENBERG and

solicited investors. These email accounts have been identified through FBI interviews of former

employees and a review of documentation obtained by the FBI from WATTENBERG's

abandoned office in downtown San Angelo. Two of the email accounts—Subject Account 3

(wattenberg.jbarron@gmail.com), and Subject Account 4 (wattenbergjmontez@gmail.com)—

belong to former Wattenberg employees, J. Barron and J. Montez, both of whom made opening

phone calls to potential investors and used the accounts, respectively, as their work email

accounts.[2]  Subject Account 2 was identified by a former employee of WATTENBERG as an email address used by employees for business purposes.  All the accounts will almost certainly contain information about the operations and correspondence of WATTENBERG, including the involvement and conduct of JOHN and STEPHEN FORTENBERRY.  Because Subject Accounts 2, 3, and 4 are business accounts used by employees of WATTENBERG, and details regarding WATTENBERG's business are relevant to the offenses being investigated, there is probable cause to believe that evidence and instrumentalities of crime are located on Subject Accounts 2, 3, and 4.

49.     A written preservation request dated June 26, 2015, requesting the preservation of all records pertaining to Subject Account 1 was sent via e-mail to Google, Inc.  A written preservation request dated August 11, 2015, requesting the preservation of all records pertaining to Subject Accounts 2, 3, and 4 was sent via e-mail to Google, Inc.  In general, an e-mail that is sent to a Gmail subscriber or from a Gmail subscriber account is stored in the subscriber's "mail box" on Google, Inc.'s servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Google, Inc.'s servers indefinitely.  Even if the subscriber deletes the e-mail, it may continue to be available on Google, Inc.'s servers for a certain period of time.

**BACKGROUND CONCERNING E-MAIL**

50.     In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the public.  Google, Inc. allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail account listed in Attachment A.  Subscribers obtain an account by registering with Google, Inc.

---

[2] Texas Workforce Commission records show that WATTENBERG reported wages paid to J. Barron and J. Montez during 2014

During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Gmail.com subscribers) and information concerning subscribers and their use of Google, Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

51.    In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

52.    In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service used, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP

address information can help to identify which computers or other devices were used to access the e-mail account.

53.     In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

## CONCLUSION

54.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, Inc. which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Reviewed by:                                            Respectfully submitted,

_____                     _____
William Johnston                                     Johnathan W. Broadway
Trial Attorney, Fraud Section                   Special Agent
Criminal Division, Department of Justice   Federal Bureau of Investigation

Subscribed and sworn to before me this _16th_ day of September, 2015

_____
Honorable E. Scott Frost
UNITED STATES MAGISTRATE JUDGE

28

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with wattenbergenergy@gmail.com,

wattenberg03@gmail.com, wattenberg.jbarron@gmail.com, and wattenbergjmontez@gmail.com

that is stored at premises controlled by Google, Inc., a company that accepts service of legal

process at 1600 Amphitheater Parkway, Mountain View, California 94043.

# ATTACHMENT B

## Particular Things to be Seized

**I.     Information to be disclosed by Google, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f) on June 26, 2015, and August 11, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails, including attachments, associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number); and

c.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

1

**II.**      **Information to be seized by the government**

All information described above in Section I that constitutes evidence and

instrumentalities of violations of 18 U.S.C. §1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud),

18 U.S.C. § 1349 (Attempt and Conspiracy), 18 U.S.C. § 1621 (Perjury), and 18 U.S.C. §§ 1956

& 1957 (Money Laundering), those violations involving STANLEY JONATHAN

FORTENBERRY, a/k/a JOHN FORTENBERRY and STANLEY STEPHEN FORTENBERRY,

a/k/a STEPHEN FORTENBERRY, individually and through their ownership and/or control of

WATTENBERG ENERGY PARTNERS, LP, and employees and associates of WATTENBERG

ENERGY PARTNERS, LP, and occurring on or after March 7, 2013, including, for each

account or identifier listed on Attachment A, information pertaining to the identity of the

person(s) who created or used the user ID, including records that help reveal the

contemporaneous whereabouts of such person(s).

2